## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

       :

       :    Miscellaneous Case No. _____

       :

       :    Underlying Litigation:

**IN RE NICHOLAS SCHMIDLE,**       :    *Hood v. City of Chicago, et al.,*

       Non-Party Movant       :    Case No. 16-cv-1970

       :    United District Court for the Northern

       :    District of Illinois

       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## NON-PARTY NICHOLAS SCHMIDLE'S MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO QUASH SUBPOENAS OR FOR A PROTECTIVE ORDER

BALLARD SPAHR LLP

Chad R. Bowman (D.C. Bar No. 484150)
Mara J. Gassmann (D.C. Bar No. 1014532)
1909 K Street, NW, 12th Floor
Washington, DC 20006
Telephone: (202) 661-2200
Fax: (202) 661-2299
bowmanchad@ballardspahr.com
gassmannm@ballardspahr.com

*Counsel for Nicholas Schmidle*

Date: July 19, 2019

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

PRELIMINARY STATEMENT ...................................................................................... 1

RELEVANT BACKGROUND ........................................................................................ 2

I.     TYRONE HOOD'S CONVICTION, 22-YEAR IMPRISONMENT, AND
EXONERATION .................................................................................................... 2

II.    THE FEDERAL CIVIL RIGHTS ACTION ...................................................... 6

III.   THE SUBPOENAS TO NICHOLAS SCHMIDLE ........................................... 8

    A.    The Document Subpoena ......................................................................... 8

    B.    The First Deposition Subpoena ............................................................... 9

    C.    The Second Deposition Subpoena ........................................................... 9

    D.    Meet-and-Confer Efforts ....................................................................... 10

ARGUMENT .................................................................................................................. 11

I.     THE DEPOSITION SUBPOENAS ARE UNENFORCEABLE ...................... 11

    A.    The First Deposition Subpoena Lacked a Place of Compliance ............ 11

    B.    The Second Deposition Subpoena Was Not Properly Served ............... 12

II.    ALTERNATELY, THE SUBPOENAS ARE PROPERLY QUASHED AS
SEEKING DISCOVERY THAT IS UNNECESSARY, CUMULATIVE
AND BURDENSOME ......................................................................................... 13

III.   ALTERNATELY, THE SUBPOENAS SHOULD BE QUASHED
BECAUSE DEFENDANTS CANNOT OVERCOME THE REPORTER'S
PRIVILEGE RECOGNIZED IN THIS CIRCUIT ........................................... 15

CONCLUSION ............................................................................................................... 18

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                **Page(s)**

*Alexander v. FBI,*
  186 F.R.D. 71 (D.D.C. 1998) .................................................................16

*In re Application to Enforce Administrative Subpoena of the U.S. Commodities*
  *Futures Trading Comm'n v. McGraw-Hill Cos.,*
  507 F. Supp. 2d 45 (D.D.C. 2007) ...........................................................17

*In re Application to Quash Subpoena to NBC,*
  79 F.3d 346 (2d Cir. 1996) .......................................................................17

*Black v. Wrigley,*
  2019 WL 1877070 (S.D. Cal. Apr. 26, 2019) ..........................................12

*Call of the Wild Movie, LLC v. Does 1-1,062,*
  770 F. Supp. 2d 332 (D.D.C. 2011) ...................................................12, 13

*Cooper v. Rezutko,*
  2019 WL 927095 (N.D. Ind. Feb. 26, 2019) ...........................................14

*In re DaimlerChrysler AG Secs. Litig.,*
  216 F.R.D. 395 (E.D. Mich. 2003) ..........................................................14

*Damiano v. Sony Music Entm't, Inc.,*
  168 F.R.D. 485 (D.N.J. 1996) ..................................................................17

*Doe v. Cummings,*
  1994 WL 315640 (N.Y. Sup. Ct. Jan. 18, 1994) .....................................17

*FTC v. Compagnie De Saint-Gobain-Pont-a-Mousson,*
  636 F.2d 1300 (D.C. Cir. 1980) ...............................................................12

*Glacier Pool Coolers, LLC v. Cooling Tower Systems, LLC,*
  2017 WL 2256755 (E.D. La. May 23, 2017) ...........................................12

*Goldberg v. Amgen, Inc.,*
  123 F. Supp. 3d 9 (D.D.C. 2015) .......................................................15, 16

*Gray v. Hoffman-La Roche, Inc.,*
  2002 WL 1801613 (D.D.C. May 27, 2002) .............................................16

*Grunseth v. Marriott Corp.,*
  868 F. Supp. 333 (D.D.C. 1994) ..............................................................16

*Hobley v. Burge,*
  223 F.R.D. 499 (N.D. Ill. 2004) ..............................................................14

*Holland v. Centennial Homes, Inc.*,
   1993 WL 755590 (N.D. Tex. Dec. 21, 1993) ...................................................18, 19

*Hutira* v. *Islamic Republic of Iran*,
   211 F. Supp. 2d 115 (D.D.C. 2002)................................................................15, 16

*Johnson v. Metro. Gov't of Nashville & Davidson Cty.*,
   2009 WL 819490 (M.D. Tenn. Mar. 27, 2009) ........................................................14

*Estate of Klieman v. Palestinian Auth.*,
   293 F.R.D. 235 (D.D.C. 2013) ........................................................................15

*Lee v. DOJ*,
   413 F.3d 53 (D.C. Cir. 2005)......................................................................14, 17

*Lee v. City of Elkhart*,
   2013 WL 1754977 (N.D. Ind. Apr. 22, 2013) .......................................................14

*Linder v. Calero-Portocarrero*,
   183 F.R.D. 314 (D.D.C. 1998) ........................................................................13

*Meide v. Pulse Evolution Corp.*,
   2019 WL 1518959 (M.D. Fla. Apr. 8, 2019).........................................................12

*Mgmt. Info. Techs., Inc. v. Alyeska Pipeline Serv. Co.*,
   151 F.R.D. 471 (D.D.C. 1993) .....................................................................2, 16

*NLRB v. Mortensen*,
   701 F. Supp. 244 (D.D.C. 1988).......................................................................15

*Palandjian* v. *Pahlavi*,
   103 F.R.D. 410 (D.D.C. 1984) ........................................................................15

*Rance v. Rocksolid Granit USA, Inc.*,
   2011 WL 13272646 (S.D. Fla. July 8, 2011)........................................................12

*Redd v. U.S. Sugar Corp.*,
   1993 WL 428667 (Fla. Cir. Ct. May 27, 1993) .....................................................17

*In re Schepmann*,
   2019 WL 1090138 (Bankr. D. Kan. Mar. 7, 2019) ................................................12

*In re Slack*,
   768 F. Supp. 2d 189 (D.D.C. 2011)............................................................15, 16, 17

*In re Subpoena to Jeffrey Goldberg*,
   693 F. Supp. 2d 81 (D.D.C. 2010) ................................................................15, 16

*Tripp v. DOD*,
    284 F. Supp. 2d 50 (D.D.C. 2003) .......................................................................... 15

*United States v. Hubbard*,
    493 F. Supp. 202 (D.D.C. 1979) ............................................................................ 16

*United States v. Philip Morris Inc.*,
    312 F. Supp. 2d 27 (D.D.C. 2004) ................................................................... 12, 13

*Zerilli v. Smith*,
    656 F.2d 705 (D.C. Cir. 1981) ........................................................................ 15, 17

**Other Authorities**

9A Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 2454 (3d ed.) ...................... 13

Fed. R. Civ. P. 26 ................................................................................................. 1, 2, 11, 14

Fed. R. Civ. P. 45 ................................................................................................. *passim*

U.S. Const. amend. I ............................................................................................ 2, 5, 17

Pursuant to Federal Rules of Civil Procedure 45(d)(3)(A)(iii)-(iv) and 26(c), journalist Nicholas Schmidle submits this memorandum of law in support of his motion to quash two non-party deposition subpoenas or, in the alternative, for a protective order.

## PRELIMINARY STATEMENT

Schmidle reported and wrote an article published in 2014 in *The New Yorker* magazine about the 1996 conviction of a Chicago man, Tyrone Hood, for a murder that it seemed likely he did not commit. When the article appeared in the magazine's pages, Hood had already served more than two decades of a 75-year prison sentence and his *pro bono* lawyers had been working for nearly seven years to exonerate him given credible allegations of police misconduct, recantations by key witnesses, and compelling circumstantial evidence pointing to another man as the likely killer. Ultimately, outgoing Illinois Governor Patrick J. Quinn commuted the remainder of Hood's sentence in January 2015. Shortly afterward, following the completion of a two-year investigation by her office's Conviction Integrity Unit, the Cook County State's Attorney asked a court to vacate Hood's conviction—which it did. Hood then filed a federal civil rights action against the City of Chicago and eleven individual police officers.

The subpoenas at issue in this motion arise from that civil rights lawsuit pending in the U.S. District Court for the Northern District of Illinois. In the final weeks of fact discovery, counsel for the police officer defendants ("Defendants") attempted to serve three different subpoenas on Schmidle in the District of Columbia, where he lived until recently.[1] The first was a document subpoena, followed by the two deposition subpoenas that are at issue in this motion. None of the subpoenas is enforceable due to insufficient service or other defects, and the

---

[1] On June 29, 2019, Schmidle and his family moved to London, England. *See* Declaration of Nicholas Schmidle ("Schmidle Decl."), ¶¶ 1, 12.

deposition subpoenas should be quashed on this basis alone.  Even beyond their procedural

failings, however, the subpoenas represent a clear fishing expedition.  They seek the testimony of

a journalist who did not personally witness the conduct at issue in the civil rights claims—*i.e.*,

police conduct in the early 1990's—but rather interviewed others about it five years ago.  As

such, Defendants seek information that is unnecessary and cumulative.  Given that Schmidle

now lives and works overseas, the subpoenas are unduly burdensome and properly dismissed

under Rule 45(d)(3)(A)(iv), and a protective order is warranted under Rule 26(c).  In addition, as

a journalist Schmidle has a qualified privilege under the First Amendment against compelled

testimony about his newsgathering activities.  Simply put, "[r]eporters cannot be dragged into

civil litigation every time a case presents an issue that would provoke a newspaper story."

*Mgmt. Info. Techs., Inc. v. Alyeska Pipeline Serv. Co.*, 151 F.R.D. 471, 477 (D.D.C. 1993).

Because the Defendants cannot overcome the privilege recognized in this Circuit, the deposition

subpoenas are also properly quashed pursuant to Rule 45(d)(3)(A)(iii).

## RELEVANT BACKGROUND

I.    **TYRONE HOOD'S CONVICTION, 22-YEAR IMPRISONMENT,
      AND EXONERATION**

The underlying civil rights litigation involve events occurring between May 1993, when

Chicago police arrested and charged Hood with murdering a collegiate basketball star named

Marshall Morgan, Jr. ("Morgan Jr."), and 1996, when a judge following a bench trial convicted

Hood of robbing and murdering Morgan Jr. and sentenced him to 75 years in prison.  Relevant

allegations about Hood's arrest and prosecution are set forth in numerous press accounts,[2]

---

[2] *See, e.g.*, Dave Savini, *2 Investigators: Was Father Of Three Wrongfully Convicted Of Murder?*, CBS 2 Chicago (Jan. 22, 2013), https://chicago.cbslocal.com/2013/01/22/2-investigators-was-wrong-man-convicted-for-serial-killers-crime/; *see also, e.g.*, Patrick M.

(continued...)

2

including Schmidle's article published in *The New Yorker*, *see* Schmidle Decl. Ex. A ("the

Article").  They are also set forth in the complaint filed by Hood.  *See* Complaint [ECF Dkt. 1],

*Hood v. City of Chicago*, No. 1:16-cv-01970 (N.D. Ill.) ("*Hood v. Chicago*") ("Compl.").  The

factual background necessary to evaluate this motion is briefly set out here.

Morgan Jr. disappeared in May 1993 and his body, mostly naked and with three gunshot

wounds, was found about a week later in the back seat of his abandoned car.  Compl. ¶¶ 10-11,

13; *see also* Article at 1-2.  The disappearance and crime drew significant public attention in

Chicago and the police investigation became a so-called "heater" case, with intense pressure on

homicide detectives to close the matter.  Compl. ¶ 23.  Although police found no usable

fingerprints in the car itself, and never located the murder weapon, they discovered various

fingerprints on items of trash strewn in the car, including Hood's fingerprints on two beer

bottles.  *Id.* ¶ 25.  Hood, then a 29-year-old, married father of three with only teenage arrests and

a misdemeanor conviction on his record, was allegedly "interrogated, coerced, and beaten" by

police over a two days, but maintained his innocence—then and ever since.  *Id.* ¶ 26; *see also*

Article at 3-5.  Police detectives subsequently obtained a confession from a man named Wayne

Washington that he participated with Hood in a robbery gone wrong of Morgan Jr., and

statements from three other men implicating Hood in a robbery and murder of Morgan Jr.

Compl. ¶¶ 33-38.  All later recanted, claiming police beat them or threatened legal consequences

if they did not cooperate.  *Id.* ¶¶ 39-43.  On the eve of trial, police also produced a new witness

---

(...continued)
O'Connell, *25 years later, commutation and imprisoned father muddy case of slain IIT basketball player*, Chi. Trib. (July 30, 2018), https://www.chicagotribune.com/news/breaking/ct-met-marshall-morgan-murder-case-20180725-story.html ("25 Years Later").

who claimed to have seen, from a second-story window, Hood driving Morgan Jr.'s car.  *Id.*
¶¶ 44-46.

Hood, represented by a public defender, waived his right to a jury trial.  *Id.* ¶ 51; Article
at 8.  Following a bench trial, a Chicago judge found him guilty of armed robbery and murder
and sentenced him to 75 years in prison.  *Id.*; *see also* Compl. ¶ 55.  At the sentencing, Hood's
attorney read his statement asserting that "'[a]n innocent man's life or freedom' was 'about to be
taken away,'" quoting a Bible verse.  Article at 8; *see also* Compl. ¶ 54.

The recantations by multiple witnesses and repeated claims of witness coercion took on a
new light in 2001 when the homicide detective who investigated Morgan Jr.'s murder became
the subject of a lengthy exposé by the *Chicago Times*.  The newspaper linked him to persistent
complaints of alleged witness abuse or intimidation, and to more than a dozen murder cases in
which the accused was acquitted, or whose charges were dismissed, despite a confession.
Compl. ¶¶ 60-63.[3]  The Illinois Torture Inquiry and Relief Commission ultimately found
"credible evidence" that the homicide detective had "used violence and threats" over the years to
coerce confessions from murder defendants.[4]

Beyond the serious questions about the testimony supporting Hood's conviction, his
lawyers—both his criminal trial lawyer and the University of Chicago Law School's Exoneration
Project and *pro bono* attorneys who took his case in 2007—have long pointed to another suspect:
Morgan Jr.'s father, Marshall Morgan, Sr. ("Morgan Sr.").  Compl. ¶ 3.  A janitor at a school

---

[3] *See also* Maurice Possley, Steve Mills & Kevin Armstrong, *Veteran detective's murder cases unravel*, Chi. Trib. (Dec. 17, 2001), https://www.chicagotribune.com/investigations/chi-011217confession-story.html.

[4] Megan Crepeau, *Murder charge dropped after 20 years in prison; Man was convicted in 1991 case tied to controversial cop*, Chi. Trib., http://digitaledition.chicagotribune.com/tribune/article_popover.aspx?guid=1f03c891-960e-4299-a741-47020e61c0a6.

located two blocks from Hood's house, Morgan Sr. had previously pleaded guilty to voluntary manslaughter for shooting and killing a friend over a debt, *id.*; *see also id.* ¶ 19, and after a 17-year absence had recently reconciled with his son at the time of Morgan Jr.'s murder, *id.* ¶¶ 3, 16. Notably, the financially stressed Morgan Sr. took out a $50,000 insurance policy on his son's life shortly after re-entering his life, and just months before the shooting, which he subsequently collected. *Id.* ¶¶ 3, 18; *see also* Article at 13.

While Hood was awaiting trial in 1995, Morgan Sr.'s fiancé was similarly shot and killed, and her body also found nude in the back seat of her abandoned car, as Morgan Jr.'s had been. Compl. ¶ 20. Marshall Sr. had a life insurance policy on her as well, taken out months before her death, and collected more than $100,000. *Id.* Then, in 2001, another person in Morgan Sr.'s life, this time his girlfriend, was shot and killed, with her body also discovered in an abandoned car. *Id.* ¶ 21; *see also* 25 Years Later. Morgan Sr. ultimately confessed to that killing, although he has denied involvement in the two previous shootings, and received a lengthy prison term. Compl. ¶ 21.[5] The Exoneration Project has argued that this pattern of similar killings of people in Morgan Sr.'s orbit, usually resulting in financial advantage, shows a "'clear modus operandi: Morgan, Sr. has killed close friends and loved ones for financial gain by shooting them … and leaving their partially or fully nude bodies in and around abandoned cars.'" Schmidle Decl. Ex. B; *see also* Compl. ¶ 3 (same). (During discovery in *Hood v. Chicago*, the incarcerated Morgan Sr. announced an intention to assert the Fifth Amendment in response to all questioning from Hood's attorneys. *See* Minute Entry, Feb. 15, 2017 [ECF Dkt. 93], *Hood v. Chicago*.)

---

[5] *See also* Nicholas Schmidle, *Video: A Confession of a Murder*, New Yorker (July 28, 2014), https://www.newyorker.com/news/news-desk/video-confession-murder.

Governor Quinn granted Hood clemency in January 2015. Compl. ¶ 56; *see also*

Schmidle Decl. Ex. B. In an interview with the *Chicago Tribune*, Quinn said that Hood's case

stood out to him: "With Tyrone Hood, I just thought that it screamed to heaven for justice. . . .

When you do it wrong, then the person who actually committed the murder goes free." *See* 25

Years Later, *supra* n.2. Weeks later, prosecutors asked a judge to vacate the convictions of both

Hood and Washington. Compl. ¶ 57. The state's attorney explained the request came following

a two-year review by her Conviction Integrity Unit, which investigates claims of wrongful

convictions.[6] She issued a statement at the time:

> Every available piece of information and evidence was pursued and examined. . . .
> After a final analysis it is my assessment that we do not have sufficient
> confidence in these convictions and therefore cannot allow them to stand.[7]

As a result of the governor's clemency and state's attorney decision to vacate his conviction,

Hood has been exonerated. Compl. ¶¶ 7, 56-57.

## II.     THE FEDERAL CIVIL RIGHTS ACTION

Hood filed his civil rights case on February 2, 2016, seeking recompense for "20 years in

prison for a crime he did not commit" and the "the emotional pain and suffering caused by losing

---

[6] A discretionary unity within the Cook County State's Attorney's Office, "[t]he Conviction Integrity Unit (the "CIU") investigates claims of actual innocence, to determine whether new evidence gives rise to a substantial probability that the convicted defendant was not the person who committed the offense of conviction." *See Conviction Integrity Unit*, Cook County State's Attorney's Office, https://www.cookcountystatesattorney.org/conviction-integrity-unit. The unit makes recommendations, including whether the state's attorney "should take steps to undo that conviction and vacate any resulting sentence." *Id.* The unit was established in 2012 following a series of police scandals, and exonerations from Cook and Harris counties alone now represent two-thirds of all national exonerations through such units. *See* Matt Masterson, *Illinois Leads Nation in Exonerations After Police Corruption Scandal*, WTTW News (April 9, 2019), *available at* https://news.wttw.com/2019/04/09/illinois-leads-nation-exonerations-after-police-corruption-scandal.

[7] Patrick M. O'Connell, *Murder conviction dismissed for man who spent 22 years in prison*, Chi. Trib. (Feb. 9, 2015), http://www.chicagotribune.com/news/breaking/ct-tyrone-hood-conviction-dismissed-met-0210-20150209-story.html.

20 years in the prime of his life," based on an allegedly wrongful prosecution that was part of a

pattern and practice of civil rights violations by Chicago police. *See* Compl. ¶¶ 79-80, 112-13.

Washington filed a similar lawsuit, and the court consolidated the two actions for discovery. *See*

Order, March 3, 2017 [ECF Dkt. 99], *Hood v. Chicago*.

The Defendants, in a 2016 discovery motion, offered this summary of Hood's claims in

the litigation:

> Plaintiff filed this civil rights suit on February 5, 2016 against the City of Chicago
> and eleven Chicago police officers ("Defendant Officers") alleging federal due
> process violations, conspiracy, failure to intervene, and malicious prosecution,
> and state law claims for malicious prosecution, intentional infliction of emotional
> distress, civil conspiracy, *respondeat superior*, and indemnification. (*See* Dkt. No.
> 1., Pltf's Compl.) These claims arise from the death investigation of Marshall
> Morgan, Jr., whose body was found abandoned in his vehicle on May 18, 1993.
> (*Id.* at ¶ 11.) As to the Defendant Officers, Plaintiff alleges they (1) coerced
> witnesses and fabricated evidence in an effort to unlawfully target Plaintiff and
> his co-defendant, Wayne Washington, (2) implicated Plaintiff by coercing a false
> confession through physical abuse from Washington, his co-defendant, and
> (3) failed to provide exculpatory evidence to the State's Attorney's Office. (*Id.* at
> ¶¶ 2-3, 24-50, 86-88, 93, 105-108, 117-120.)
>
> Plaintiff also brings a *Monell* claim directly against the City, asserting that (1) the
> Defendant Officers' coercion of false statements from Washington and other
> witnesses were undertaken pursuant to the policy and practice of the Chicago
> Police Department ("CPD"), (2) the systematic suppression of evidence pertaining
> to fabricated and coerced statements from the Cook County State's Attorney's
> Office (CCSAO) and from criminal defendants was, as a matter of policy and
> practice, condoned and this practice facilitated a code of silence within the CPD,
> (3) the City's failure to train, supervise and discipline its officers effectively
> condoned, ratified and sanctioned the Defendant Officers' alleged actions, (4) the
> CPD's policy and practice of withholding its "street files" from the CCSAO and
> criminal defendants allowed Defendant Officers to violate Plaintiff's civil rights,
> and (5) that the final policymakers ratified each of these policies and practices
> through deliberate indifference, which allowed the practices to flourish. (*Id.* at ¶¶
> 59, 67, 69, 73-78.)

*See* Def. City of Chicago's Mot. to Bifurcate and Stay Discovery of Pl.'s Municipal Liability

Claim, Nov. 15, 2016 [ECF Dkt. 71], *Hood v. Chicago*.

Fact discovery was originally slated to extend through April 30, 2018.  *See* Status Rep. with Proposed Agreed Scheduling Order, April 5, 2017 [ECF Dkt. 103], *Hood v. Chicago*.  By spring 2017, Hood had produced some 17,000 documents (and the parties and third parties had exchanged nearly 40,000 total documents) and the parties jointly proposed nearly 60 depositions. *Id.* at 4-5.  The court over the past two years has extended fact discovery four separate times to give the parties ample time.[8]  On June 13, 2019, the Court denied a motion for yet another 90-day extension, but granted a 30-day extension, to August 19, 2019.[9]

## III.    THE SUBPOENAS TO NICHOLAS SCHMIDLE

Defendants purported to serve Schmidle with three separate subpoenas in the waning weeks of fact discovery, as summarized below and in Schmidle's declaration.

### A.    The Document Subpoena

On March 7, 2019, just over a month before fact discovery in *Hood v. Chicago* was then-scheduled to close, Schmidle received a subpoena by certified mail in Washington, D.C.  *See* Schmidle Decl. ¶ 7 & Ex. C (the "Document Subpoena").  The Document Subpoena called for the production of documents on March 18, 2019, with no personal appearance necessary, in Baltimore.  *Id.* Ex. C.  The subpoena was remarkably broad, seeking "[a]ny and all Documents and written materials that relate to" Schmidle's three articles about Hood for *The New Yorker*, as well as all documents relating to over *fifty* named individuals and entities relating to the Article. *Id.* at 6.

---

[8] *See* Minute Entry, Jan. 1, 2018 [ECF Dkt. 132], *Hood v. Chicago*; Minute Entry, May 10, 2018 [ECF Dkt. 137], *Hood v. Chicago*; Minute Entry, Dec. 13, 2018 [ECF Dkt. 197], *Hood v. Chicago*; Minute Entry, March 14, 2019 [ECF Dkt. 245], *Hood v. Chicago*.

[9] *See* Minute Entry, June 13, 2019 [ECF Dkt. 265], *Hood v. Chicago*.

Through counsel, Schmidle timely objected to the document subpoena pursuant to Rule 45(d)(2)(B), on both procedural grounds (including improper service by mail rather than personal service) and substantive grounds (including the journalist's privilege). *See* Schmidle Decl. ¶ 8 & Ex. D. Defendants have not moved to compel responses to the Document Subpoena, and therefore it is not at issue in this motion.[10]

### B.      The First Deposition Subpoena

On June 18, 2019, a process server personally served Schmidle with a deposition subpoena ("the First Deposition Subpoena"). Schmidle Decl. ¶ 9 & Ex. E. The First Deposition Subpoena did not seek any documents, included a witness fee, and said that Schmidle should appear at a location "TBD" on July 12, 2019, for a deposition. Schmidle Decl. Ex. E .

### C.      The Second Deposition Subpoena

On June 27, two days before Schmidle was scheduled to move to London with his family, a process server left a document on the front mat of his home in Washington, D.C. and departed. Schmidle Decl. ¶ 10. She did not personally serve him. *Id.* After the process server left, Schmidle photographed the document through a window:

---

[10] On July 10, 2019, Schmidle received *by email* another copy of the Document Subpoena, apparently sent by an agent of Defendants. Schmidle Decl. ¶ 13. A cover letter stated: "Please send the requested records along with the signed and dated Compliance Form." *Id.* ¶ 13-14 & Ex. G. The email made no mention of the March 13, 2019 objection by counsel, or the fact that, by then, undersigned counsel for Schmidle had met and conferred with counsel for the Defendants. *Id.* & Ex. G; *see also* Part III.D, *infra*.



*Id.* Schmidle then retrieved the document, which was similar to the First Deposition Subpoena, except it identified a specific place in Washington, D.C. for a July 12, 2019 deposition ("the Second Deposition Subpoena"). *Id.* ¶ 11 & Ex. F. Two days later, Schmidle moved to England, where he currently lives as he works on his second book (following a residency at Rockefeller Center in Italy from July 8-29, 2019). *Id.* ¶ 12.

**D.    Meet-and-Confer Efforts**

Undersigned counsel contacted the attorney for Defendants who signed the subpoenas, and ultimately had a meet-and-confer telephone conference on July 3, 2019 to raise objections to the deposition subpoenas based on service, relevance and undue burden, and the journalist's privilege recognized in the D.C. Circuit. Counsel for Defendants confirmed that the purpose of a deposition would be to examine Schmidle about his journalistic work on the Article and related stories about Hood for *The New Yorker*, and in particular his communications with Hood and with Hood's attorneys. Counsel for Defendants offered to take the deposition in London and disagreed with Schmidle's claims about the lack of necessity of the testimony and the application

of the journalist's privilege, arguing that Schmidle's article was influential in the commutation of

Hood's sentence and therefore that the deposition is necessary to the case. Recognizing the

necessity of judicial resolution of the dispute, counsel agreed to take the July 12 deposition off

the calendar pending motion practice and agreed that Schmidle would file this motion to quash

by July 19, 2019.

**ARGUMENT**

Both the First Deposition Subpoena and the Second Deposition Subpoena represent

procedurally flawed attempts to take the testimony of a journalist who wrote a magazine article

five years ago—and some two decades after the events at issue in the underlying litigation—and

who now lives overseas. This Court should quash the deposition subpoenas as unenforceable in

light of their technical and service flaws, or alternately quash them on one of two alternate bases:

(1) the sought-after discovery is cumulative, unnecessary, and unduly burdensome, *see* Fed. R.

Civ. P. 45(d)(3)(A)(iv), 26(c); or (2) it is clear that Defendants cannot overcome the reporters'

privilege recognized in civil cases in this Circuit, *id.* 45(d)(3)(A)(iii).

## I.     THE DEPOSITION SUBPOENAS ARE UNENFORCEABLE

Defendants twice attempted to serve a deposition subpoena on Schmidle. In both

instances, they failed to comply with the straightforward strictures of Rule 45, and those

subpoenas are accordingly defective and unenforceable.

### A.     The First Deposition Subpoena Lacked a Place of Compliance

The First Deposition Subpoena is unenforceable because it failed to specify the location

where the deposition was to take place. It simply directed him to appear at "TBD" (or, in the

cover correspondence, "a location yet to be determined") at 10 a.m. on July 12, 2019. *See*

Schmidle Decl. Ex. E. The Federal Rules of Civil Procedure require non-party deposition

subpoenas to specify a place for compliance.  Fed. R. Civ. P. 45(a)(1)(A)(iii) ("Every subpoena

must . . . command each person to whom it is directed to do the following at a specified time and

place: attend and testify . . . ."); *see also id.* 45(c)(1)(A) (a subpoena's commanded "place of

compliance" must be within 100 miles from witness's residence or place of employment).

Because the First Deposition Subpoena failed to comply with this mandate, it is "facially

invalid." *Black v. Wrigley*, 2019 WL 1877070, at *4 (S.D. Cal. Apr. 26, 2019); *see also, e.g.*,

*Meide v. Pulse Evolution Corp.*, 2019 WL 1518959, at *6 (M.D. Fla. Apr. 8, 2019) (quashing

subpoena that failed to identify a "date, time, or place"); *Glacier Pool Coolers, LLC v. Cooling

Tower Systems, LLC*, 2017 WL 2256755, at *2 (E.D. La. May 23, 2017) (quashing subpoena

with multiple flaws, including that the subpoena "fails to identify the place for compliance");

*Rance v. Rocksolid Granit USA, Inc.*, 2011 WL 13272646, at *5 (S.D. Fla. July 8, 2011)

(quashing subpoena that failed to "specify a precise time for the deposition"); *cf. In re

Schepmann*, 2019 WL 1090138, *5 & n.44 (Bankr. D. Kan. Mar. 7, 2019) (quashing subpoena

that failed to comply with Rule 45, including by omitting time and place of compliance).

**B.      The Second Deposition Subpoena Was Not Properly Served**

The Second Deposition Subpoena was not properly served and therefore cannot cure the

First Deposition Subpoena or compel Schmidle to attend a deposition.  Federal Rule 45(b)(1)

provides that "[s]erving a subpoena requires delivering a copy to the named person."  Fed. R.

Civ. P. 45(b)(1).  Courts in this Circuit require "in-hand delivery" on an actual person.  *FTC v.

Compagnie De Saint-Gobain-Pont-a-Mousson*, 636 F.2d 1300, 1323-24 (D.C. Cir. 1980)

(witness would not be held in contempt for ignoring a Rule 45 subpoena that was not "delivered

in person," "even if the witness had received actual notice of the proceeding"); *Call of the Wild

Movie, LLC v. Does 1-1,062*, 770 F. Supp. 2d 332, 361-62 (D.D.C. 2011) (granting motion to

quash subpoena not personally served); *United States v. Philip Morris Inc.*, 312 F. Supp. 2d 27,

37-38 (D.D.C. 2004) (because "Fed. R. Civ. P. 45(b)(1) requires personal service of deposition subpoenas," quashing subpoenas left in mail room or given to support staff rather than deponents). Thus, "it is not sufficient to leave a copy of the subpoena at the dwelling place of the witness." 9A Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 2454 (3d ed.). Yet that is precisely what Defendants did: leave a copy of the Second Deposition Subpoena on the ground outside Schmidle's home. Schmidle Decl. ¶¶ 10-11; *see also supra* at 9-10. Requiring valid service may elevate form over substance where a recipient "acknowledges that it received the subpoena at issue," but it is nevertheless necessary and "the plaintiff is required to comply with Rule 45(b)(1)." *Call of the Wild Movie, LLC*, 770 F. Supp. 2d at 362. The Second Subpoena is also properly quashed.

## II.   ALTERNATELY, THE SUBPOENAS ARE PROPERLY QUASHED AS SEEKING DISCOVERY THAT IS UNNECESSARY, CUMULATIVE AND BURDENSOME

As Defendants have themselves stated, the factual basis for Hood's claims in the underlying case arise from the actions of Chicago homicide detectives in the *early 1990s. See supra* at 7. Imposing burdens on a journalist living overseas to obtain testimony about his newsgathering for a magazine story reported decades later is plainly unwarranted. Deposition subpoenas are properly quashed because Schmidle's testimony is unnecessary to the litigation of this case, and therefore the burden they impose cannot be justified. As this court has held, "factors to be considered in the undue burden analysis include relevance, the need of the party for the [discovery], whether the request is cumulative and duplicative, the time and expense required to comply with the subpoena (relative to the responder's resources), and the importance of the issues at stake in the litigation." *Linder v. Calero-Portocarrero*, 183 F.R.D. 314, 319 (D.D.C. 1998).

The only articulated basis by counsel for Defendants for seeking Schmidle's testimony is to obtain additional information about the journalist's contacts with Hood and Hood's agents— including because some documents produced by Hood involve written communications. However, Hood had produced more and 17,000 documents in discovery *as of April 2017*. Defendants *already have* these documents, and can ask Hood or his agents about them.  Under the Federal Rules, the court must limit discovery that "is unreasonably cumulative or duplicative." Fed. R. Civ. P. 26(b)(2).

Courts regularly quash fishing expeditions against journalists under the Federal Rules, without even reaching a privilege analysis.  In *Lee v. City of Elkhart*, for example, the Northern District of Indiana quashed a third-party subpoena to a news organization by a civil rights plaintiff.  2013 WL 1754977, at *1, *4 (N.D. Ind. Apr. 22, 2013).  The court found the subpoena to pose an undue burden where the party serving the subpoena failed to demonstrate "that the information is relevant or that he has a significant need for the information."  *Id.* at *4; *see also, e.g.*, *Hobley v. Burge*, 223 F.R.D. 499, 504-05 (N.D. Ill. 2004) (quashing civil subpoenas seeking journalistic work product pursuant to Fed. R. Civ. P. 45 where enforcement "would impose an undue burden" on a reporter by disclosing journalistic work product); *Cooper v. Rezutko*, 2019 WL 927095, at *7 (N.D. Ind. Feb. 26, 2019) (same); *In re DaimlerChrysler AG Secs. Litig.*, 216 F.R.D. 395, 403 (E.D. Mich. 2003) (same); *Johnson v. Metro. Gov't of Nashville & Davidson Cty.*, 2009 WL 819490, at *2-3 (M.D. Tenn. Mar. 27, 2009) (same), *objections overruled*, 2009 WL 1952780 (M.D. Tenn. July 2, 2009).  In other words, even apart from reporter's privilege, "the usual requirements of relevance, need, and limited burdens on the subpoenaed person still apply." *Lee v. DOJ*, 413 F.3d 53, 60 (D.C. Cir. 2005)

Given the questionable need of Schmidle's testimony for the underlying case, the same result is warranted here. *See, e.g.*, *In re Subpoena to Jeffrey Goldberg*, 693 F. Supp. 2d 81, 87 (D.D.C. 2010) (quashing subpoena to journalist that was cumulative). The deposition subpoenas, to the extent that the Court deems them enforceable, are properly quashed.

## III.   ALTERNATELY, THE SUBPOENAS SHOULD BE QUASHED BECAUSE DEFENDANTS CANNOT OVERCOME THE REPORTER'S PRIVILEGE RECOGNIZED IN THIS CIRCUIT

Schmidle is a journalist, Schmidle Decl. ¶ 1, and the Defendants plainly seek to examine him regarding his newsgathering for the Article and other reports published in *The New Yorker*, *see, e.g.*, Document Subpoena. In this Circuit, a journalist may not be compelled to disclose information received in the course of gathering the news by a civil litigant absent extraordinary circumstances, *Zerilli v. Smith*, 656 F.2d 705, 713 (D.C. Cir. 1981). This privilege applies to both confidential information, such as the identity of sources, and non-confidential information obtained in the course of gathering the news. *See, e.g.*, *Goldberg v. Amgen, Inc.*, 123 F. Supp. 3d 9, 16-17 (D.D.C. 2015); *Estate of Klieman v. Palestinian Auth.*, 293 F.R.D. 235, 242-43 (D.D.C. 2013); *In re Slack*, 768 F. Supp. 2d 189, 193-94 (D.D.C. 2011); *In re Subpoena to Jeffrey Goldberg*, 693 F. Supp. 2d at 85; *Tripp v. DOD*, 284 F. Supp. 2d 50, 54 (D.D.C. 2003); *Hutira* v. *Islamic Republic of Iran*, 211 F. Supp. 2d 115, 121 (D.D.C. 2002); *NLRB v. Mortensen*, 701 F. Supp. 244, 247 (D.D.C. 1988); *Palandjian* v. *Pahlavi*, 103 F.R.D. 410, 412 (D.D.C. 1984). Schmidle's newsgathering for the Article included both confidential and non-confidential sources. Schmidle Decl. ¶ 3. Both aspects of the privilege require a showing of heightened need for information from a news organization. *Tripp*, 284 F. Supp. 2d at 54-55.

Because the journalist's privilege applies to both confidential and non-confidential newsgathering, "courts in this jurisdiction have not required journalists to invoke the journalist's

privilege on a question-by-question basis before obtaining protections from the court."
*Goldberg*, 123 F. Supp. 3d at 22.  In *Goldberg v. Amgen, Inc.*, for example, this Court considered
a third-party subpoena to a D.C. journalist arising from federal securities litigation pending in
California—and quashed that subpoena because the proponent of discovery failed to overcome
the privilege.  *Id.* at 13.  In essence, the judge in *Goldberg* concluded that there was no need to
wait and evaluate a privilege asserted in the context of specific questions, because the party
seeking discovery could not make a sufficient threshold showing to justify any discovery at all.[11]
Indeed, this Court has routinely quashed deposition subpoenas to journalists where a party
seeking discovery could not demonstrate the centrality of requested discovery and exhaustion of
all reasonable alternatives to obtain it.  *See, e.g., In re Slack*, 768 F. Supp. 2d at 195-98 (quashing
deposition subpoena to journalist); *In re Subpoena to Jeffrey Goldberg*, 693 F. Supp. 2d at 85-89
(same); *Hutira*, 211 F. Supp. 2d at 124 (same); *Gray v. Hoffman-La Roche, Inc.*, 2002 WL
1801613, at *1 (D.D.C. May 27, 2002) (same); *Alexander v. FBI*, 186 F.R.D. 71, 74 (D.D.C.
1998) (same); *Grunseth v. Marriott Corp.*, 868 F. Supp. 333, 335-37 (D.D.C. 1994) (same);
*Alyeska Pipeline*, 151 F.R.D. at 477-78 (same); *United States v. Hubbard*, 493 F. Supp. 202, 205
(D.D.C. 1979) (same).

   The Court should do the same here.  The privilege "typically prevails because any
interest in overcoming the privilege is by definition a private rather than public interest." *In re
Slack*, 768 F. Supp. 2d at 194 (quoting *In re Application to Enforce Administrative Subpoena of
the U.S. Commodities Futures Trading Comm'n v. McGraw-Hill Cos.*, 507 F. Supp. 2d 45, 50
(D.D.C. 2007)).  Indeed, in a civil case "if the privilege does not prevail in all but the most

---

[11] In the event that the Court denies the motion to quash, Schmidle reserves his right to assert
privilege objections to specific questions posed at any deposition.  The privilege issue raised in
this motion is whether Defendants can meet their burden for a deposition to proceed at all.

exceptional cases, its value will be substantially diminished." *Zerilli*, 656 F.2d at 712.  Thus,

"the court must examine how important, not just relevant, the reporter's information is to the

party's case." *In re Slack*, 768 F. Supp. 2d at 194.  This is not a situation where Schmidle is the

*only* source of information about the *central fact* in the lawsuit, such as the identity of a leaker in

a leaks lawsuit.  *Lee*, 413 F.3d at 58-59.  Rather, it appears that Defendants merely hope to find

impeachment material against Hood arising from communications that long post-date the facts

relevant to the claims—*i.e.*, police conduct in the early 1990s.  But the presumptive protections

afforded by the First Amendment can be overcome only by a showing that the information

sought from a reporter or news organization goes to "the heart of the matter" and has been

requested only after "every reasonable alternative source of information" has been exhausted.

*Zerilli*, 656 F.2d at 713 (citation omitted); *accord Lee*, 413 F.3d at 59.

   Courts around the country routinely reject "possible impeachment" as a rationale

justifying abrogation of the reporter's privilege.  *See, e.g., In re Application to Quash Subpoena*

*to NBC*, 79 F.3d 346, 352 (2d Cir. 1996) ("Ordinarily, impeachment material is not critical or

necessary to the maintenance or defense of a claim . . . ."); *Damiano v. Sony Music Entm't, Inc.*,

168 F.R.D. 485, 497 (D.N.J. 1996) ("[T]he material in question is being sought to impeach the

defendant with his own words, and impeachment will not suffice as it does not 'go to the heart of

the plaintiff's claim.'" (citation and alterations omitted)); *Redd v. U.S. Sugar Corp.*, 1993 WL

428667, at *2 (Fla. Cir. Ct. May 27, 1993) ("[T]he possible use of the information for

impeachment does not go to the heart of issues before the Court . . . ."); *Doe v. Cummings*, 1994

WL 315640, at *2 (N.Y. Sup. Ct. Jan. 18, 1994) ("The possibility that any of the requested

statements could be used at a future time for impeachment is not sufficient to overcome the

protection afforded the press by the statute."); *Holland v. Centennial Homes, Inc.*, 1993 WL

755590, at *6 (N.D. Tex. Dec. 21, 1993) ("[M]ere speculation of possible impeaching material" is insufficient ground for ordering journalist to produce tapes of interviews with plaintiffs sought by defendants).  This Court should do so as well.

Because there appears no basis for overcoming the reporter's privilege to examine Schmidle about his reporting of the Article, the Court should quash the First Deposition Subpoena and the Second Deposition Subpoena on this ground as well.

## CONCLUSION

For all of the foregoing reasons, this motion to quash should be granted.

Dated:  July 19, 2019

Respectfully submitted,

BALLARD SPAHR LLP

Chad R. Bowman (D.C. Bar No. 484150)
Mara J. Gassmann (D.C. Bar No. 1014532)
1909 K Street, NW, 12th Floor
Washington, DC 20006
Telephone: (202) 661-2200
Fax: (202) 661-2299
bowmanchad@ballardspahr.com
gassmannm@ballardspahr.com

*Counsel for Nicholas Schmidle*