**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| TYRONE HOOD, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, KENNETH BOUDREAU, | ) | Case No. 1:19-mc-00123 |
| JOHN HALLORAN, BERNARD RYAN, | ) | Honorable Judge Amit P. Mehta |
| ROBERT LENIHAN, JOHN POLUSZNY, | ) | |
| MICHAEL CLANCY, JOHN BALL, JAMES | ) | Underlying Litigation: |
| O'BRIEN, GERALD CARROLL, ELIZABETH | ) | *Hood v. City of Chicago, et al.,* |
| SHINN, AND JOHN STOUT, | ) | Case No. 16-cv-1970 |
| | ) | |
| Defendants. | ) | United States District Court |
| | ) | for the Northern District of Illinois, |
| v. | ) | Eastern Division |
| | ) | |
| NICHOLAS SCHMIDLE, | ) | |
| | ) | |
| Non-Party Respondent. | ) | |

**INDIVIDUAL OFFICERS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION TO TRANSFER AND IN SUPPORT OF THEIR OPPOSITION TO NON-
PARTY NICHOLAS SCHMIDLE'S MOTION TO QUASH OR FOR PROTECTIVE
ORDER**

  _/s/ John J. Rock_____
*One of the attorneys for the Individual
Officers*

John J. Rock
Rock Fusco & Connelly, LLC
321 N. Clark Street, Suite 2200
Chicago, Illinois 60654
(312) 494-1000
(312) 494-1001 (fax)
jrock@rfclaw.com

## TABLE OF CONTENTS

PRELIMINARY STATEMENT……………………………………………………………………..1

BACKGROUND FACTS……………………………………………………………………………….3

    I.      Hood's Media Strategy……………………………………………………………5

    II.    *The New Yorker* Story and The Evidence……………………………………6

    III.   Attempts to Serve Schmidle……………………………………………………...10

ARGUMENT……………………………………………………………………………………11

    I.      THE MOTION SHOULD BE TRANSFERRED TO THE NORTHERN DISTRICT
OF ILLINOIS PURSUANT TO RULE 45(f)…………………………………….11

    II.    MR. SCHMIDLE'S MOTION SHOULD BE DENIED…………………………15

         A.  The Deposition Subpoenas Are Enforceable…………………………………15

             1.   The first deposition subpoena was properly served………………………15

             2.   The second deposition subpoena was properly served……………………16

         B.  Mr. Schmidle's Deposition Is Not Unnecessary,
Cumulative or Burdensome……………………………………………………..18

         C.  The Reporter's Privilege Does Not Apply……………………………………20

CONCLUSION……………………………………………………………………………..23

## <u>TABLE OF AUTHORITIES</u>

*Ali v. Mid-Atlantic Settlement Services, Inc.,* 233 F.R.D. 32, 36 (D.D.C. 2006)…………………17

*Carey v. Hume,* 492 F.2d 631, 637 (D.D.Cir. 1974)…………………………………………………21

*Estate of Klieman v. Palestinian Authority,* 293 F.R.D. 235, 242
    (D.D.C. Sept. 19, 2013)……………………………………………………………22, 23

*Flanagan v. Wyndham Int'l Inc.,* 231 F.R.D. 98, 102 (D.D.C. 2005)………………………...18, 19

*Gambone v. Lit-Rock Drywall Corp. Advanced Constr. Material Corp.,*
    2003 WL 21891584, at \*4 (E.D.Pa. Aug. 7, 2003)……………………………………..17

*Goldberg v. Amgen, Inc.,* 123 F.Supp.3d 9, 16 (D.D.C. Aug. 21, 2015)…………………………21

*Hobley v. Burge* 223 F.R.D. 449, 504 (N.D. Ill. Sept. 17, 2004)……………………………..20, 21

*In re UBS Financial Services, Inc. of Puerto Rico Securities Litigation,*
    113 F.Supp.3d 286, 288 (D.C.C. July 9, 2015)……………………………………….....13

*Judicial Watch, Inc. v. Valle Del Sol, Inc.,* 307 F.R.D. 30, 34 (D.D.C. 2014)…………..11, 12, 13

*Lee v. City of Elkhart* 2013 WL 1754977, at \*1, 4
    (N.D. Ind. Apr. 22, 2013)……………………......................................................20

*Lee v. Department of Justice,* 401 F.Supp.2d 123, 134 (D.D.C. 2005)……………………………22

*Matthias Jans & Associates, Ltd. v. Dropic,* 2001 WL 1661473 (W.D. Mich. 2001)……………..16

*McKevitt v. Pallasch,* 339 F.3d 530, 532-33 (7th Cir. 2003)………………………………………...21

*NLRB v. Mortensen*, 701 F. Supp. 244, 249 (D.D.C. 1988)………………………………………22

*Novak v. World Bank,* 703 F.2d 1305, 1310 n. 14 (D.C. Cir. 1983)………………………………17

*Ott v. City of Milwaukee,* 682 F.3d 552, 557 (7th Cir. 2012)………………………………...18

*Sourgoutsis v. U.S. Capitol Police,* 323 F.R.D. 100, 105 (D.D.C. Nov. 21, 2017)……………..18

*U.S. Commodity Futures Trading Com'n v. McGraw-Hill Companies, Inc.,*
    507 F.Supp.2d 45, 50 (D.D.C. 2007)……………………………………………20, 21

Wright & Miller, 9A Fed. Prac. & Proc. Civ. § 2454 (3d ed.)……………………………………17

*Wultz v. Bank of China, Ltd.,* 304 F.R.D. 38, 42 (D.D.C. 2014)……………………………...12, 16

*XY, LLC v. Trans Ova Genetics, L.C.,* 2014 WL 4437728
(D.D.C. Sept. 10, 2014)……………………………………………………………12, 14

*York Group, Inc. v. Wuxi Taihu Tractor Co., Ltd,* 632 F.3d 399, 402 (7th Cir. 2011)…………….17

Defendants Kenneth Boudreau, John Halloran, Bernard Ryan, Robert Lenihan, John Poluszny, Michael Clancy, John Ball, James O'Brien, Gerald Carroll, Elizabeth Shinn, and John Stout submit this Memorandum of Law in support of their Motion to Transfer and in support of their Opposition to Non-Party Nicholas Schmidle's Motion to Quash or for Protective Order.

## PRELIMINARY STATEMENT

In 1996, Plaintiffs Tyrone Hood and Wayne Washington were both convicted of the 1993-armed robbery and murder of Marshall Morgan, Jr.  Hood was convicted after a bench trial, and Washington pleaded guilty after his first trial ended in a hung jury.  Hood was sentenced to a combined term of 75 years and Washington was sentenced to 25 years in exchange for his plea.

On his last day in office, January 12, 2015, former Illinois Governor Pat Quinn commuted Plaintiff Hood's 75-year sentence to time served.[1]  Gov. Quinn's decision set in motion a chain of events that led directly to the reversal of Plaintiffs' convictions and these lawsuits, but the decision was not based on the discovery of any new evidence exonerating Hood or Washington, such as DNA or eyewitness testimony excluding them from the crime – that evidence does not exist. Rather, it was the product of an intense media campaign by Hood's attorneys involving local and international celebrities, "friendly reporters" and, primarily, *The New Yorker* Magazine.  (*See* "Trying a Case Outside the Courts," University of Chicago Law School, January 7, 2016, attached as Exhibit A; *see also* Transcript of Panel Discussion for "Trying a Case Outside the Courts," held at the University of Chicago Law School, January 6, 2016, p. 32: 1-6, attached as Exhibit B).  This campaign was formed and directed by the Exoneration Project ("EP") as a "more dynamic" alternative to the courts.[2]  (Ex A, p. 2).  Its purpose was to try Hood's case, unopposed, in the court

---

[1]         Washington had already completed his sentence.

[2]         The EP is, in effect, an alter ego for the law firm representing Plaintiff Hood in his civil rights lawsuit, Loevy & Loevy ("L&L").  The EP is located in L&L's office space and the EP's attorneys are also L&L attorneys.

of public opinion in order to get Gov. Quinn's attention and convince him to release Hood, and it relied on the same misleading arguments that courts had consistently rejected over the previous 25 years.

The "evidence" the former Governor relied upon came directly from Hood's attorneys and surrogates advocating on Hood's behalf, chief among them *The New Yorker*, which published a lengthy story that Hood's attorneys had a hand in developing.  (*See* Emails between Hood's attorneys and N. Schmidle, attached as Group Exhibit C; *see also* Nick Schmidle, *Crime Fiction: Did the Chicago police coerce witnesses into pinpointing the wrong man for murder?*, *The New Yorker*, Aug. 4, 2014, attached to Exhibit D as ILPRB000015-29).  Although Plaintiffs now claim they are innocent of Morgan Jr.'s homicide, they have never been able to undermine key pieces of evidence connecting them to the crime, namely: Hood's fingerprints, which were found on items in the same car as Morgan Jr.'s body; an eyewitness (Emanuel Bob) who observed Hood and Washington with the victim's car after the victim's disappearance; Washington's own confession, which also implicates Hood; and Washington's guilty plea.   With nothing to undermine the evidence linking them to the crime, however, Plaintiffs have pushed their "real killer" theory (*i.e.,* that Morgan Jr.'s father, Marshall Morgan Sr. did it) as a way to prove indirectly they are innocent and would not have been convicted but for police misconduct. (*See generally* Dkt. 1, Hood's Complaint).[3]  Mr. Schmidle's story in *The New Yorker* became the centerpiece of this effort and the chief source of information for Gov. Quinn.[4]  And Gov. Quinn made no secret of his reliance on Mr. Schmidle's story in *The New Yorker* as the basis for his decision.  (Ex. B, p. 8: 16-21).

---

[3]	Unless otherwise stated, all references to Dkt entries are for *Hood v. City of Chicago*, No. 16-cv-1970 in the Northern District of Illinois.

[4]	The Illinois Prisoner Review Board ("IPRB"), which reviews and advises the Governor on petitions for clemency, apparently did not investigate the clemency petition, make a recommendation or even prepare a report for Gov. Quinn.  (*See* IPRB's subpoena response, labeled ILPRB000001-ILPRB00032, which includes *The New Yorker* article, attached as Exhibit D).

In his petition for clemency, Hood characterized Schmidle's story as representative of the "enormous amount of attention from the national news media" and called it "a 14-page profile *supporting* [Hood's] innocence in the widely circulated *New Yorker* magazine." (*See* Letter to Gov. Quinn dated Nov. 25, 2014, attached as ILPRB000011-14 to Exhibit D) (emphasis added). The message Hood was sending is clear: if a nationally-known and famous magazine is willing to put its weight and credibility behind Hood's innocence, presumably after it had scrutinized and checked the facts, the Governor should too.   But Schmidle's email exchanges with Hood's attorneys and his involvement in their investigation suggest there may have been less scrutiny and independence and more advocacy.   Hood's team not only had a hand in influencing the story, they provided information for Mr. Schmidle to use, such as depositions from other cases and opinions on alleged past systemic *Brady* violations.   (*See* Ex. C).   In other words, the story selectively includes evidence and themes provided by Hood's attorneys to make a convincing argument for Hood's innocence, to the exclusion of evidence that undermines Hood's claims.   It is exactly the type of "friendly" journalism Hood's team envisioned in their plan to try the case outside of the courts, and Schmidle appears to have crossed the line from journalist to advocate in creating a story championing Hood's cause.   (*See* Ex. B, p. 32: 1-6).

Defendants seek to take Schmidle's deposition to explore his role in Hood's coordinated media campaign, because that campaign was critical to Hood convincing Gov. Quinn to grant clemency.   And as the magistrate judge presiding over this case in the Northern District of Illinois has already ruled, the clemency decision is relevant to Hood's claim of innocence.   (Dkt. 247).

## BACKGROUND FACTS

Schmidle's motion, much like his reporting for *The New Yorker*, takes the position that Plaintiffs are innocent, were wrongfully convicted as a result of police misconduct, and then

exonerated by the Governor's act of clemency, and that the evidence strongly indicates the real killer was Morgan Jr.'s father, Marshall Morgan Sr. But this recitation of the facts is taken largely from Schmidle's reporting for *The New Yorker*, stories by other "friendly reporters" and Plaintiff Hood's complaint. In fact, the case is far more complex, and does not lead to the conclusion that Hood is innocent.

For starters, Plaintiffs have been peddling the same "real killer" theory without success for the last 25 years; no court has yet accepted these arguments, found the evidence used to convict Plaintiffs insufficient, or found Plaintiffs innocent of the crime. (*See* Order denying Petitions for Certificates of Innocence, attached as Exhibit E).[5] This includes the trial court that initially convicted Hood, which considered Hood's alternative killer theory and barred it. And until Governor Quinn granted Hood's clemency request on his last day in office on January 12, 2015, the Cook County State's Attorney's Office ("SAO") had been aggressively fighting Plaintiff Hood's successive post-conviction attempts to vacate his conviction. (*See* the State's Brief in Opposition to Hood's Successive Post-Conviction, attached as Exhibit F). The Circuit Court of Cook County, Illinois denied every claim in that petition (including the pattern and practice police misconduct claims and alternative killer theory) except for an alleged *Brady* violation stemming from the State's purported failure to disclose it had paid a periphery witness $1,000 in travel expenses. (*See* Order denying in part and granting in part Hood's successive PC Petition, attached as Exhibit G). That claim alone was advanced to a third-stage evidentiary hearing, but the hearing

---

[5]     Under Illinois law, once a conviction has been vacated, the defendant can petition the State for a certificate of innocence, but defendant bears the burden of proof by a preponderance of the evidence. *See e.g.*, 735 ILCS 5/2-702.

never took place thanks to Quinn's last-minute act of clemency.[6]  All of Hood's other arguments were rejected.[7]

### Hood's Media Strategy

In November 2014, Hood's attorneys sent Gov. Quinn a letter requesting executive clemency for Hood.  (*See* Ex. D, ILPRB000011-29).  The clemency petition was the culmination of a carefully crafted and intense media campaign by Hood's attorneys, which EP members described at a panel discussion with Gov. Quinn and Hood.  According to the EP's Executive Director, the campaign on Hood's behalf was their "biggest foray into really trying a more dynamic way of trying a case outside the courts."  (Ex. B, p. 26: 1 – 27: 1).  In fact, EP attorneys credit the media with "playing a huge role in multiple stages with Hood," including the ability to either pressure Gov. Quinn or get his attention over 4,000 other petitions.  (*Id.*, p. 15: 5 – 16: 9).  One of the "big advantages" the EP had to offer was its media contacts and "friendly reporters who will report on these stories when we ask them to."  (Ex. B, p. 32: 1-6).  Consistent with that "advantage," the highlight of the package to Gov. Quinn was a copy of Mr. Schmidle's feature-length story from *The New Yorker*, which Gov. Quinn seems to have relied on almost entirely.  (Ex. D, ILPRBT000015-29).   According to Gov. Quinn, the "*New Yorker* magazine deserved a lot of credit" for delving into the story and finding "troublesome issues with respect to the prosecution of Tyrone Hood."  (Ex. B, p. 8: 16-21).  Around the same time Gov. Quinn received the clemency petition with the lengthy *New Yorker* story, he also began receiving calls from Renee Ferguson, a

---

[6]     Under the Illinois post-conviction statute, a petitioner challenging his conviction or sentence must prove that there was a substantial denial of his rights under the U.S. Constitution and/or Illinois Constitution that was not and could not have been raised on direct appeal of the conviction or sentence.  *See, e.g.,* 725 ILCS 5/122.

[7]     Schmidle quotes a press release by the SAO that suggests the Office had lost confidence in the evidence supporting the convictions; but the convictions were vacated only a month after Gov. Quinn granted clemency. Nothing explains the SAO's sudden change of heart after years of opposing Hood's efforts to vacate the conviction, other the fact that Hood can never return to prison, regardless of what would have happened with the alleged *Brady* violation, because his sentence was commuted.

former local reporter for NBC in Chicago, requesting that Quinn "please look at [Hood's] case." (Ex. B, p. 8: 22 – 9: 8).

### *The New Yorker* Story and The Evidence

The emails between Mr. Schmidle and Hood's attorneys suggest Mr. Schmidle was given direction and specific evidence to develop his story. (*See* Ex. C). Hood's attorneys also got Schmidle access to impounded evidence. (*See* Motion to View Impounded Evidence and Agreed Order from the Circuit Court of Cook County, Illinois, dated January 17, 2014, attached as Group Exhibit H). According to a recent deposition of Karl Leonard, one of Hood's post-conviction attorneys, Mr. Schmidle went along with Hood's lawyers to inspect this evidence.[8] As far as Defendants can tell from the record, no other journalist was given the same access as Mr. Schmidle.

The clemency petition and *New Yorker* story make unsupported and easily debunked assertions about the sufficiency of the evidence and Morgan Sr.'s alleged insurance fraud *modus operandi* connection to his son's death. For example, each relies in part on a half-truth to suggest Morgan Sr. had a financial motive to kill his son: that Morgan Sr. purchased a life insurance policy for his son only six months before his son's murder, the timing of which, they argue, is evidence of Morgan Sr.'s intent to kill his son for the insurance money. This contention omits an important and easily discoverable fact that undermines the insurance fraud theory: Morgan Sr. had actually purchased life insurance for Morgan Jr. and a daughter as far back as 1985, almost ***eight years*** before the murder, through a rider to his own life insurance policy. (*See* Deposition of L. Burklin, p. 196-198, with Allstate Insurance Application Forms, attached as Exhibit I). None of this is mentioned in Hood's clemency petition or *The New Yorker*. Schmidle's story does, however, quote an insurance "expert" to opine that it is not normal for parents to purchase life insurance

---

[8]        A transcript of this deposition has been ordered but not yet received.

policies for their adult children.  Allstate's own investigator, on the other hand, testified it was not unusual for life insurance policies to be purchased for adult children on Chicago's south side. (Deposition of S. Jakush, p. 559-560, attached as Exhibit J).

The insurance fraud *modus operandi* similarly falls apart with respect to the murders of William Hall and Deborah Jackson, to which Morgan Sr. confessed.  They involved arguments, not a scheme to trigger a windfall payment through insurance fraud.  Morgan Sr. admitted to killing William Hall in 1977 over a debt when he became upset.  (Supplementary Report of Morgan Sr.'s Confession, dated January 10, 1997, p. 4-5, attached as Exhibit K).  He admitted to killing Deborah Jackson during an argument when a gun dropped out of her purse and he picked it up and shot her "in a rage."  (*See* Morgan Sr.'s Court-Reported Confession to Murder of Deborah Jackson, dated September 21, 2001, p. 11, attached as Exhibit L).  Even if debts were a factor in both killings (as opposed to uncontrolled anger), there is a fundamental difference that separates the murders of Hall and Jackson from Morgan Jr.:  they did not trigger any automatic windfall, like Morgan Jr.'s did, and Morgan Sr. effectively ruled out any chance of recovering unpaid debts by killing them. None of this was mentioned in Schmidle's story.

The other circumstances "echoing" throughout the four murders, such as nudity and the relationship of each to Morgan Sr., are likewise overstated.  Hall (Morgan Sr.'s friend) was found clothed; Morgan Jr. (his son) was found with a shirt, but no pants, underwear or shoes; Soto (his lover) was found completely nude; and Jackson (another lover) was not nude at all.  She was found wearing a black dress with a pink jacket wrapped around her arms.  (*See* Supplemental Detective Report, attached as Exhibit M).  The presence or absence of clothing and the relationship of each to Morgan Sr. are not idiosyncratic, distinctive traits suggesting a *modus operandi*. The same is true with respect to the involvement of a car.  Hall was killed in a car but his body was left in an

alley; Morgan Jr. and Soto were found between the back and front seats of their respective cars, and Jackson was found in the trunk of her car.

The only similarities between the Soto and Morgan Jr. murders are that Morgan Sr. knew both and was a beneficiary of life insurance for both, and both were found in a similar location in cars. Nothing else, such as location of gunshot wounds, connects them (e.g., Morgan Jr was shot once in the abdomen and twice in the back and Soto was shot through the jaw and a finger was shot off).

The most distinctive and idiosyncratic elements of the four cases, on the other hand, are not emphasized in Schmidle's story. For example, Morgan Sr. confessed to killing Hall and Jackson out of anger and he does not contest his confessions, but denied killing Morgan Jr. and Soto. And missing from the murders of Hall, Soto and Jackson is perhaps the most idiosyncratic detail of all: Morgan Sr.'s alleged use of decoy evidence (i.e., random bottles from a dumpster) to mislead police. No decoy evidence has ever been alleged or identified in the murders of Hall, Soto or Jackson. The story ignores these facts.

Schmidle also includes in the story a significant amount of unrelated "background" information about accusations of misconduct against certain detectives and the Chicago police in general, without attempting to connect any of it to Hood. For example, the story discusses past accusations of abuse against Detective Ken Boudreau, which Boudreau denies, without establishing a connection between the accusations and Boudreau's treatment of Hood. The story also makes a reference to a notorious former detective, Jon Burge, who was suspended in 1991, two years before the Morgan Jr. homicide occurred, and then fired in 1993, the same year the Morgan Jr. homicide even occurred.[9]

---

[9]        https://en.wikipedia.org/wiki/Jon_Burge

The story notes that Detective John Halloran once asserted his Fifth Amendment right to silence to questions regarding mistreatment of suspects in an unrelated lawsuit.  But the story omits that in the same lawsuit, *Hill v. City of Chicago, et al.*, 06-C-6772 (U.S. District Court, Northern District of Illinois), Halloran subsequently decided to waive that right and answer the questions. (*See* Judge St. Eve's Order in *Hill* dated Jan. 28, 2010 attached as Exhibit N).  These facts did not make it into Mr. Schmidle's story.[10]

The story also emphasizes that witnesses recanted their statements, without questioning the circumstances surrounding the recants.  For example, Washington signed an affidavit in 2009 in which he claimed to have confessed as a result of "beatings" at the hands of police.  The affidavit was procured by Hood's attorneys and former NBC Chicago reporter Renee Ferguson, who had also been working with EP attorneys to get Quinn's attention.  She went with Hood's lawyers to interview Washington in 2009 at a time when Washington was unrepresented.  As a result of this meeting, Washington eventually signed an affidavit littered with false claims about police abuse and the reason he confessed.   (*See* Washington's Affidavit, attached as Exhibit O; *see* Washington's deposition testimony, p. 247-273, 276-279, 578-573, attached as Exhibit P). Washington tried to explain away some of the falsehoods by suggesting they were misunderstandings or mistakes, or by playing semantics over the meaning of words like "beatings." (*Id.*).  Some claims, however, he admitted were false, like the handwritten addition to the affidavit that he was punched by police officers.  (*Id.*, p. 254:17–255:15).  Washington was interviewed for a true-crime television show, and gave another false and exaggerated description of the alleged abuse he claims led to his confession.  (*Id.*, p. 169-173).  At his deposition, Washington conceded

---

[10]     The story notes that Boudreau once asserted the Fifth Amendment privilege as well, but Boudreau spoke to Mr. Schmidle for the story, and Mr. Schmidle managed to locate deposition testimony of Boudreau answering questions from attorney Russell Ainsworth about claims of abuse.  Mr. Ainsworth is one of Hood's attorneys of record in this lawsuit too.

that since 1995, he has given six different accounts of what happened that led to his confession. (*Id.*, p. 276: 10 – 279: 10).   Yet Schmidle does not question or scrutinize Washington's recant; it is simply taken at face value.

### Attempts to Serve Schmidle

As Schmidle points out, he was served with a document subpoena in March 2019.   This subpoena was similar to a subpoena served on *The New Yorker*, and Defendants had not attempted to compel a response from Mr. Schmidle or *The New Yorker*.   It is not at issue in this motion.   Mr. Schmidle also notes he received an email with the same March 2019 document subpoena attached. The email was sent by "US Legal Support."   This communication occurred *after* Schmidle's attorney and Defendants' attorney had already met by phone and conferred, and makes no mention of the meet-and-confer or the agreement by the attorneys as to how to proceed.   Defendants did not authorize this communication, had no idea it happened until they received Schmidle's motion, and would not have allowed it to occur if US Legal had asked Defendants for authorization before sending the email.   That said, Defendants are not seeking to enforce the document subpoena.

As for the deposition subpoenas, Mr. Schmidle was personally served with the first one (which he does not dispute), but it did not include a location.   Defendants subsequently had an identical second subpoena served, which included a location.   According to the process server, Mr. Schmidle was personally served with the second deposition subpoena by dropping it at his doorstep, after Mr. Schmidle refused to open the door and accept service.   (*See* Declaration of L. Wade, attached as Exhibit Q).

## ARGUMENT

### I.   THE MOTION SHOULD BE TRANSFERRED TO THE NORTHERN DISTRICT OF ILLINOIS PURSUANT TO RULE 45(f).

Discovery thus far has proven to be as complex as the issues involved in this case. Contrary to Mr. Schmidle's claim that everything Defendants need can be located in 17,000 documents, this case has generated a massive number of documents; more than 150,000 have been produced by the parties and various third-parties. In addition, nearly 50 depositions have been taken, with approximately 10 more to go, not including experts, and the magistrate judge overseeing this case has had to rule on several discovery-related motions involving various privileges, including former Gov. Quinn's motion to quash his deposition subpoena (which the court denied).[11] (Dkt. 247). Because of the deeply fact-intensive nature of the case and the magistrate judge's familiarity with it, Mr. Schmidle's motion should be transferred to the Northern District of Illinois pursuant to Rule 45(f), which provides that a court may transfer a motion if exceptional circumstances exist. "While a prime concern is to avoid burdens on local nonparties subject to subpoenas, this interest of the nonparty…in obtaining local resolution of the motion must be balanced with the interests in ensuring the efficient, fair, and orderly progress of ongoing litigation before the issuing court." *Judicial Watch, Inc. v. Valle Del Sol, Inc.,* 307 F.R.D. 30, 34 (D.D.C. 2014) (*citing* Fed.R.Civ.P. 45(f) advisory committee's note (2013 amendments)) (internal citations omitted). As the Advisory Committee Notes to Rule 45(f) explain, "transfer may be warranted in order to avoid disrupting the issuing court's management of the underlying litigation, as when the court has already ruled on issues presented by the motions or the same issues are likely to arise in discovery in many districts."

---

[11]   Gov. Quinn filed an objection to the magistrate's ruling, which is briefed and pending before Judge Andrea Wood.

When evaluating whether "exceptional circumstances" exist, "the Court must not assume[] that the issuing court is in a superior position to resolve subpoena related motions, but instead consider a number of factors relating to the underlying litigation." *Judicial Watch, Inc.*, 307 F.R.D. at 34 (*citing* Fed.R.Civ.P. 45(f) advisory committee's note (2013 amendments)) (internal citations omitted). "These factors include the complexity, procedural posture, duration of pendency, and the nature of the issues pending before, or already resolved by, the issuing court in the underlying litigation." *Id.; see, e.g., XY, LLC v. Trans Ova Genetics, L.C.,* 2014 WL 4437728, at *1-2 (D.D.C. Sept. 10, 2014) (finding exceptional circumstances where issuing court "has already supervised substantial discovery and begun preparations for trial"); *Wultz v. Bank of China, Ltd.,* 304 F.R.D. 38, 46 and n.6 (D.D.C. May 30, 2014) (transferring subpoena-related motions in "highly complex" litigation where issuing court "is in a better position to rule…due to her familiarity with the full scope of issues involved as well as any implications the resolution of the motion will have on the underlying litigation" and to further "the interest in obtaining consistent rulings on the issues presented").

Here, the factors weigh in favor of transferring the motion. For starters, these are complex lawsuits, intertwining in almost every respect, and involving the rare case where a former Governor of Illinois has been ordered to sit for his deposition to explain his clemency decision. Mr. Schmidle maintained a close relationship with Hood's attorneys, borrowed significantly from theories in Hood's post-conviction pleadings and wrote a story for *The New Yorker* that was the basis for Gov. Quinn's clemency decision. Those theories have been and will continue to be extensively litigated in the issuing district, which means the magistrate judge overseeing discovery has a better understanding of the issues involved and how those issues impact whether Mr. Schmidle should sit for his deposition.

The duration of the case in the Northern District of Illinois also weighs in favor of transferring the motion. *See Judicial Watch, Inc.,* 307 F.R.D. at 35 (issuing court in better position to evaluate the relevance and necessity of the subpoena because the underlying case was pending for four years and involved innumerable discovery disputes). Between these two complex cases, the parties have had several discovery disputes over the last three years, and many hearings discussing every type of discovery in the underlying matter. In 2015, this Court granted a motion to transfer because that case had been pending in the issuing court for three and a half years, the judge had issued multiple orders resolving procedural and discovery disputes, it was a complex case, and the issuing court was in a better, more informed position. *In re UBS Financial Services, Inc. of Puerto Rico Securities Litigation,* 113 F.Supp.3d 286, 288 (D.C.C. July 9, 2015) (Mehta, J.).

The same reasoning applies here. Over the last three years the district judge and magistrate judge presiding over these cases in the Northern District of Illinois have already reviewed and decided the following substantive discovery motions (most of which were decided by the magistrate judge):

- The City's motion to bifurcate the *Monell* claim and stay discovery (Dkt. 71, 74, 81 and 86);

- Defendant Shinn's motion to compel answers to contention interrogatories (Dkt. 94, 97 and 98);

- Defendants' motion challenging Hood's assertion of work-product over Washington's draft affidavit (Dkt. 150, 165, 174, (includes a surreply 180, 181) and 193);

- Plaintiff Hood's motion to compel documents responsive to RFP No. 25 and supplemental position paper regarding the same (Dkt. 172, 190 and 191);

- Defendant City's renewed motion to bifurcate and stay discovery of Plaintiff's *Monell* claim (Dkt. 195, 201, 212 and 231);

- Former Gov. Quinn's motion to quash (Dkt. 205, 226, 234, (includes a surreply 235, 238) and 247);

- Plaintiff Hood's motion to compel Rule 30(b)(6) depositions (Dkt. 199, 214, 216 and 232);

- The parties' respective positions on Judge Wood's suggestion regarding partial summary judgment with respect to the *Brady* claim (Dkt. 231, 239);

- Former Gov. Quinn's appeal and objection to the magistrate judge's denial of his motion to quash (Dkt. 251, 252, 254, 257 and 262);

- Plaintiff Hood's motion for protective order regarding the deposition of his investigator (Dkt. 255 and 261).

- Defendant City's motion to structure discovery (Dkt. 263 and 265);

- Plaintiff's unopposed motion to take Marshall Morgan Sr.'s deposition (Dkt. 266, 269);

- Plaintiff's motion for rule to show cause against Marshall Morgan Sr. for refusing to sit for his deposition (Dkt. 272).

In addition, the magistrate judge has already ruled on a similar motion by former Gov. Quinn and understands the unique circumstances regarding the relevance of Quinn's testimony to the claim of innocence, the role Defendants believe Mr. Schmidle's story in *The New Yorker* played in that decision and the similar privilege assertions. Nor is Mr. Schmidle the only reporter to have been subpoenaed. Renee Ferguson was also subpoenaed for a deposition, and her attorney is currently weighing whether to file a motion to quash. The judges in the Northern District of Illinois presiding over this case are in a better position to decide Mr. Schmidle's motion.

As for burden, there is none, because Mr. Schmidle is represented by a national law firm (presumably hired by his former employer, *The New Yorker*) and his attorney is already admitted to practice in the Northern District of Illinois.[12] *See Trans Ova Genetics, L.C.,* 2014 WL 4437728,

---

[12] For courts of admission, see https://www.ballardspahr.com/people/attorneys/bowman-chad

at *2 (transferring subpoena-related motion where local nonparty was national corporation "and thus the presumption of local resolution, carried less force") (*citing In re Subpoena to Kia Motors Am., Inc.,* 2014 WL 2118897, at *1 (C.D. Cal. Mar. 6, 2014)).  Further, Mr. Schmidle is no longer "local" to Washington D.C.; he lives in London so it is unlikely he will travel to either district for resolution of the motion.[13]  Even if he did, there is no increased burden if the motion is resolved in Illinois.  And as the Advisory Committee Notes indicate, "If the motion is transferred, judges are encouraged to permit telecommunications methods to minimize the burden a transfer imposes on nonparties."  Defendants have every reason to believe Mr. Schmidle's attorney would be able to appear by telephone in the Northern District of Illinois, and certainly would not oppose telephonic appearances.  Accordingly, the Court should transfer the motion to the Northern District of Illinois.

## II.      MR. SCHMIDLE'S MOTION SHOULD BE DENIED.

### A.      The Deposition Subpoenas Are Enforceable.

#### 1.      The first deposition subpoena was properly served.

Mr. Schmidle admits the first deposition subpoena was personally served on him and was procedurally valid and enforceable under Rule 45 with the exception of the location of the deposition, which was marked as "TBD."  Defendant Officers included a letter with the subpoena informing Mr. Schmidle to contact their counsel to accommodate his schedule.  Defendant Officers put "to be determined" in the "place" column of the subpoena in good faith so they could fully accommodate Mr. Schmidle's schedule, not to cause an undue burden or go beyond the geographical limit allowed in Rule 45(c).

---

[13]      *See* Declaration of Nicholas Schmidle, ECF 1-9 at ¶ 1.

The lack of a location does not make the subpoena unenforceable, however, because under Rule 45(d)(3)(A), courts may use their discretion to allow a party to later modify a defective subpoena. *Wultz,* 304 F.R.D. at 42. When the location requirement of a subpoena is defective or ambiguous, the court may modify the location element so that it complies with the geographical limits of Rule 45(c). *See, e.g., Matthias Jans & Associates, Ltd. v. Dropic,* 2001 WL 1661473, at *3 (W.D. Mich. 2001) (rather than quashing subpoena that was defective with respect to the location component of the subpoena, the subpoena was modified to require its recipient to appear for deposition "at a place to be agreed upon by all counsel, no greater than 100 miles" from the nonparty deponent's residence). Defendant Officers have agreed to depose Mr. Schmidle near his home in London, England at a time and place that accommodates him. Mr. Schmidle admitted he was personally served with the first deposition subpoena. Thus, a simple modification of the personally-served subpoena will prevent any unfair prejudice or burden on any party or nonparty. Moreover, and as explained below, Defendants promptly sought to cure this defect by having Mr. Schmidle served with a second subpoena with the location identified.

### 2. The second deposition subpoena was properly served.

Mr. Schmidle was properly served with the Second Deposition Subpoena too. Although Mr. Schmidle claims he was not personally served, the process server's declaration demonstrates that service was effectuated by leaving the subpoena at Mr. Schmidle's door after he refused to accept service. (*See* Ex. Q). Ms. Wade recognized Mr. Schmidle from the first service attempt, and as Mr. Schmidle acknowledges in his own declaration, he recognized her. (*Id.*; *see also* Declaration of Nicholas Schmidle in this case, ECF 1-9 at ¶ 1). Ms. Wade approached Mr. Schmidle's residence, noticed the clear storm door was closed and front main door open, saw Mr. Schmidle sitting on his couch, and knocked. Mr. Schmidle came to the door and Ms. Wade

recognized him and told him she was there to serve legal documents on him.  Mr. Schmidle said he would not accept them.  Ms. Wade informed him that she would drop serve him due to his refusal, and the documents were left on his front porch.  (*See* Ex. Q).

Mr. Schmidle's declaration does not state whether the process server knocked on his door, stated her purpose, or tried to serve him, but it is reasonable to assume that if she had not done these things he would have indicated as much in his declaration.  Instead, he admits he recognized the process server from the prior service, lending credibility to Ms. Wade's declaration that she did make the attempt to serve him.  The photograph Mr. Schmidle attaches to his declaration likewise confirms the process server did exactly what she claims.

Although the D.C. Circuit requires in-person service, "[i]n recent years a growing number of cases have departed from the view that personal service is required and alternatively have found service of a subpoena under Rule 45 proper absent personal service."  Wright & Miller, 9A Fed. Prac. & Proc. Civ. § 2454 (3d ed.).  In this case, Mr. Schmidle knew he was being served and purposefully refused to open his door, and therefore service was properly effectuated by leaving the subpoena at his door.  S*ee, e.g., Novak v. World Bank,* 703 F.2d 1305, 1310 n. 14 (D.C. Cir. 1983) ("When a person refuses to accept service, service may be effected by leaving the papers at a location, such as on a table or on the floor, near that person."); *Ali v. Mid-Atlantic Settlement Services, Inc.,* 233 F.R.D. 32, 36 (D.D.C. 2006) (refusing to open the door does not invalidate service, as personal service does not need to be made face to face or hand to hand.); *Gambone v. Lit-Rock Drywall Corp. Advanced Constr. Material Corp.,* 2003 WL 21891584, at *4 (E.D.Pa. Aug. 7, 2003) (finding service effective when process server found defendant at his dwelling house and announced her business but defendant refused to accept personal service, and process server left papers under the door mat); *York Group, Inc. v. Wuxi Taihu Tractor Co., Ltd,* 632 F.3d 399,

402 (7th Cir. 2011) (service of subpoena effective under Rule 45 by leaving the subpoena at the door of the residence of the person to be served on the belief that the person was inside at the time, but was refusing to answer the door in order to evade service). *Ott v. City of Milwaukee,* 682 F.3d 552, 557 (7th Cir. 2012) (service of a non-party subpoena can be accomplished via certified mail; personal service is not necessary for proper service under Rule 45).

**B.     Mr. Schmidle's Deposition Is Not Unnecessary, Cumulative or Burdensome.**

Mr. Schmidle argues his testimony is not needed, because the alleged purpose of the deposition is to go on a fishing expedition about his contacts with Hood or Hood's attorneys.  Not only is Mr. Schmidle wrong about the purpose – it is far more than asking about contacts – but he has failed to meet the burden required under Rule 45 to be excused from his deposition.  "The party moving for relief bears the burden of showing that the subpoena should be quashed or modified."  *Sourgoutsis v. U.S. Capitol Police,* 323 F.R.D. 100, 105 (D.D.C. Nov. 21, 2017) (*quoting* Fed.R.Civ.P. 45(d)(3)).  "The quashing of a subpoena is an extraordinary measure, and is usually inappropriate absent extraordinary circumstances.  *Id.* (*quoting Flanagan v. Wyndham Int'l Inc.,* 231 F.R.D. 98, 102 (D.D.C. 2005)).  Thus, a "movant's burden is greater for a motion to quash than if [the movant] were seeking more limited protection."  *Id.* (*quoting Flanagan,* 231 F.R.D. at 102).  Rules 26 and 45 provide the grounds for quashing a subpoena, which include requests that are unreasonably cumulative or duplicative or expose a person to annoyance, embarrassment, oppression, or undue burden."  *Flanagan,* 231 F.R.D. at 104 (*citing* Fed.R.Civ.P. 26(b)(2), 26(c), 45(d)(3)(A)(iv)).

Mr. Schmidle was not on the sidelines reporting a story from a distance.  He was an advocate in the thick of the effort to exonerate Hood through a public relations campaign.  That effort is relevant because it led to the clemency decision, which Hood touts as an official

recognition of his innocence by the State of Illinois.  The "articulated basis" for Mr. Schmidle's deposition is and always has been his role in Hood's media strategy.  This goes beyond who he spoke with in the course of news-gathering and into his role as a *de facto* advocate for Hood and reasons for selecting certain information for inclusion in the story.  Defendants are entitled to question him as to how Hood may have directed or influenced the story, how the story developed and his understanding of the purpose of the story, as Hood's lawyers articulated during the panel discussion at the University of Chicago Law School: to pressure high ranking state officials, like Gov. Quinn or the State's Attorney of Cook County.  And because Mr. Schmidle's work led to Gov. Quinn's act of clemency (which has already been found a relevant and discoverable topic by the magistrate judge), it follows that Mr. Schmidle's work, which so heavily influenced Gov. Quinn, is likewise relevant.  It is also what sets this case apart from the typical request for a journalist's information.

Mr. Schmidle's speculation that the 17,000 documents produced by Hood in this case will suffice for what he can offer not only gets the scope of discovery wrong by tens of thousands of documents, but it also misses the point.  Mr. Schmidle was a part of Hood's media campaign, whether he knew it or not, and he appears to have given Hood some say, if not a lot, in the direction of the story.  The influence Hood's attorneys had in developing the story is relevant to Hood's use of the clemency as an official recognition by the State of Illinois that he is innocent.  *See, Flanagan,* 231 F.R.D. at 103 (a court with jurisdiction over a discovery dispute for an action pending in a different district "should hence be cautious in determining relevance of evidence, and in case of doubt should err on the side of permissive discovery.") *citing Heat & Control, Inc. v. Hester Indus., Inc.* 785 F.2d 1017, 1024 (Fed. Cir. 1986).  That information is not in old police reports or investigative files.

Mr. Schmidle's burden argument is likewise speculative and unsupported.  It is no more burdensome to depose him in London than it would be in this district if Mr. Schmidle still lived here.  To be clear, though, Defendants will go to London to take this deposition or do it via video conference at a time and place convenient for Mr. Schmidle.  This means Mr. Schmidle would suffer no more burden than any other deponent.

Finally, the cases Mr. Schmidle cites do not support his position.  In *Lee v. City of Elkhart* 2013 WL 1754977, at *1, 4 (N.D. Ind. Apr. 22, 2013), the court quashed the subpoena because the serving party "made no effort to explain the potential relevance of the information [sought]."  *Id.* at *4.  Unlike *Lee*, here Defendants have offered a multitude of reasons as to why Mr. Schmidle's deposition is relevant and necessary.  In *Hobley v. Burge* 223 F.R.D. 449, 504 (N.D. Ill. Sept. 17, 2004), the court actually denied the non-party journalist's motion to quash a document subpoena with respect to the journalist's written communications with plaintiff, but granted the motion with respect the journalist's notes of communications with plaintiff because the plaintiff and the journalist's agreement not to disclose or use information provided by plaintiff to the journalist. The opposite is true here:  instead of restricting Mr. Schmidle's use of information based on confidentiality, Hood's express purpose was to make the story appealing and persuasive enough to reach Gov. Quinn and sway him.

## C.     The Reporter's Privilege Does Not Apply.

Mr. Schmidle also argues he should not have to testify based on the reporter's privilege. "Whether the privilege prevails in a given case is determined by a balancing test." *U.S. Commodity Futures Trading Com'n v. McGraw-Hill Companies, Inc.,* 507 F.Supp.2d 45, 50 (D.D.C. 2007). "The balancing test requires evaluation of two factors: (1) the need for the information and (2) whether the party seeking the information has exhausted all reasonably available alternative

sources." *Id.* (*citing Zerilli v. Smith,* 656 F.2d 705, 713-14 (D.C.Cir. 1981)). The balance of interests favors disclosure if the requested information is crucial to a party's case. *Id.*; *see, Carey v. Hume,* 492 F.2d 631, 637 (D.D.Cir. 1974) (overriding the privilege when the information goes to "the heart of the matter").

Notably, however, the "[D.C. Circuit] has not decided whether non-confidential information is subject to the reporter's privilege." *Goldberg v. Amgen, Inc.,* 123 F.Supp.3d 9, 16 (D.D.C. Aug. 21, 2015). The Seventh Circuit, on the other hand, in *McKevitt v. Pallasch,* 339 F.3d 530, 532-33 (7th Cir. 2003), and its progeny, "has specifically rejected the argument that the First Amendment provides journalists special protection against subpoenas, at least with respect to information from non-confidential sources." *Hobley,* 223 F.R.D. 499, 502 (N.D. Ill. 2004). Similarly, this district applies a less stringent standard when the party seeking to compel reporter testimony seeks non-confidential information, as is the case here:

> [C]ourts have recognized that a party seeking to compel reporter testimony faces a less weighty burden when seeking non-confidential information. When a party seeks to compel a reporter to testify regarding nonconfidential information, the risk of debilitating a journalist's ability to gather information is considerably diminished. Consequently, the showing needed to overcome a reporter's privilege when the information sought is nonconfidential is less demanding than the showing required where confidential materials are sought.

*Goldberg,* 123 F.Supp.3d at 17. (citations omitted) (internal quotation marks omitted).

The first factor has been satisfied. As set forth in Section II.B above, Mr. Schmidle was a part of Hood's media campaign, whether he knew it or not, and he appears to have given Hood's attorneys a voice in the direction of the story. The influence Hood's attorneys had in developing the story is relevant to Hood's plan to try the case outside the courts, and his use of clemency as an official recognition by the State of Illinois that he is innocent. Moreover, Defendants do not seek Schmidle's confidential sources. Instead, Defendants intend to question him on the media

21

strategy, his role in it, the selection of content for the story and his communications with Hood's attorneys.  This information is important to addressing Hood's innocence claims and how the *New Yorker* story influenced Gov. Quinn.

The second factor is likewise met, because Defendants have run into roadblocks trying to get this information from Hood.  Hood's attorneys have made it known they will not allow any other attorneys to be deposed, and the depositions of Hood's post-conviction attorney and private investigator were largely comprised of overly broad privilege assertions.[14]  The work-product privilege assertions should not apply to the media strategy because: (1) the strategy was not intended for litigation (in fact, it was intended to be outside the scope of litigation); and (2) Hood's attorneys waived the privilege by publicly discussing it at the panel discussion at the University of Chicago Law School.  Nonetheless, Hood's attorneys have taken the position that questions related to the media strategy are off limits.  Similarly, Gov. Quinn is still opposing his deposition, even though the magistrate judge denied his motion to quash.  Schmidle's deposition goes to the heart of how Hood was able to convince a sitting Governor to commute his sentence, in which Schmidle played a role.  *See, e.g., Estate of Klieman v. Palestinian Authority,* 293 F.R.D. 235, 242 (D.D.C. Sept. 19, 2013) (subpoenaed information went to heart of the matter because it was could potentially prove the relationship between the defendants and the organization that killed the decedent); *Lee v. Department of Justice,* 401 F.Supp.2d 123, 134 (D.D.C. 2005) (since none of defendants admitted to being source of leaked information, and plaintiff's case could not proceed without testimony from journalists about who leaked the information, it was central to case); *NLRB v. Mortensen,* 701 F. Supp. 244, 249 (D.D.C. 1988) (Plaintiff would not have a fair opportunity to prove unfair labor practices without authentication of management council's statements to press).

---

[14]     The depositions were taken recently and have been ordered.

Further, to the extent Mr. Schmidle argues that his testimony would be based on what others told him, and, thus, not admissible at trial, that argument lacks any merit. *Klieman,* 293 F.R.D. at 243-244 (the inadmissibility at trial of the evidence sought does not preclude its disclosure by a reporter).

## <u>CONCLUSION</u>

For the reasons set forth herein, Defendants Kenneth Boudreau, John Halloran, Bernard Ryan, Robert Lenihan, John Poluszny, Michael Clancy, John Ball, James O'Brien, Gerald Carroll, Elizabeth Shinn, and John Stout, respectfully request that the Court enter an order granting their Motion to Transfer or in the alternative, denying Non-Party Nick Schmidle's Motion to Quash or for Protective Order, and for any further relief the Court deems just and appropriate.  A copy of Defendants' Proposed Order is attached hereto as Exhibit R.

Respectfully submitted,

Dated: August 5, 2019                         */s/ John J. Rock*_____
                                                            Attorney for Defendant Officers

John J. Rock
Rock Fusco & Connelly, LLC
321 N. Clark Street, Suite 2200
Chicago, Illinois 60654
Telephone: (312) 494-1000
Fax: (312) 494-1001
jrock@rfclaw.com